**PREMIER GOLF MISSOURI, LLC, Respondent,**

v.

**STALEY LAND COMPANY, LLC and Staley Farms Homeowners' Association, Appellant.**

No. WD 69341.

Missouri Court of Appeals, Western District.

March 31, 2009.

Ward Keith Brown, Liberty, MO, for Appellant.

Eric Chadworth Carter, Prairie Village, KS, for Respondent.

Before: LISA WHITE HARDWICK, Presiding Judge, JOSEPH M. ELLIS, Judge and JOSEPH P. DANDURAND, Judge.[1]

JOSEPH M. ELLIS, Judge.

Staley Land Company, LLC and Staley Farms Homeowners' Association (together, "Appellants") appeal from a summary judgment in favor of Premier Golf Missouri, LLC ("Premier") on Premier's petition for declaratory judgment.

Premier has owned and operated a private 18–hole golf course and related amenities known as the Staley Farms Golf Course ("the Golf Club") since 2002. In March 2005, Premier sold the surrounding property to Staley Land Company, LLC

---

1. Joseph P. Dandurand, Judge, participated in oral argument but was not a member of the Court when this opinion was handed down.

("Staley Land"), a real estate development company. The surrounding property was known as the Staley Farms residential subdivision and was run by the Staley Farms Homeowners' Association ("the Homeowners' Association"). Mark Simpson was the managing member of Staley Land and the president of the Homeowners' Association. On March 2, 2005, Staley Land and Premier entered into a Golf Course Development Agreement, under which they agreed to cooperate with each other concerning the development of the residential subdivision and the Golf Club.

The property sold to Staley Land included a clubhouse facility known as the Residents' Club, which was renamed the Sports and Rec Club after the sale ("the Clubhouse"). As part of the Development Agreement, Staley Land agreed to lease the Clubhouse to Premier for a nominal rent of $1.00 per year for a term of 99 years. Accordingly, on May 1, 2005, Staley Land and Premier executed a Triple Net Lease of the Clubhouse for operation as part of the Golf Club ("the Lease"). Premier was to maintain and operate the Clubhouse at its sole expense. Staley Land assigned the Lease to the Homeowners' Association at some point in May 2005.

On January 1, 2007, Premier and the Homeowners' Association, as successor Landlord, executed an Amendment to the Lease to allow Premier to make alterations to the Clubhouse, including creating a snack room and relocating and renovating the workout room. Premier was to complete the alterations at its sole expense and to have the alterations "substantially completed and ready for use by May 31, 2007." Premier immediately commenced construction.

On January 31, 2007, Appellants' attorney faxed a letter to Premier declaring that Premier was in default of the Lease for (1) allowing individuals who were not residents of the Staley Farm residential subdivision to become "social members" of the Golf Club and to use the Clubhouse and (2) prohibiting any food or beverages in the Clubhouse unless purchased from Premier. The letter stated that both of these actions were "contrary to the parties' intentions" and in violation of the Lease and gave Premier thirty days to cure the alleged defaults.

On February 22, 2007, Premier filed a petition for injunctive relief and declaratory judgment against Staley Land and the Homeowners' Association, followed by an amended petition. Premier asserted that it would be irreparably harmed if Appellants terminated the Lease and sought a determination that it was not in default for selling social memberships to non-residents or prohibiting outside food and beverages because the Lease did not expressly prohibit such activities. Premier alleged that it had sold social memberships to non-residents "for some time, even before the signing of the Triple Net Lease" and that nothing in the Lease restricted it from setting its own policy regarding consumption of food and beverages. Premier also made several allegations concerning the purpose and importance of the non-resident social memberships.

On March 9, 2007, Appellants' attorney sent a letter to Premier by fax and certified mail, referring to the January 31, 2007 letter and making the following "demands," as relevant to this appeal:

(1) Premier must immediately cease allowing use of the Clubhouse by individuals who were not "golf members" of the golf course or residents of the Staley Farms residential subdivision.

(2) Premier must immediately provide documentation that all contractors work-

ing on the alterations to the Clubhouse were insured and that all required permits had been obtained. The letter indicated that Premier was "already in default of the Lease" for failing to obtain building permits from the city.

(3) Premier must immediately provide a list of all subcontractors and suppliers for the alterations and copies of mechanic's lien waivers for all subcontractors and suppliers.

(4) Premier must immediately provide evidence that the insurance coverage required under the Lease had been in effect since May 1, 2005, and remained in effect.

The letter provided that Premier had thirty days to "comply" with each of these demands and that Appellants would terminate the Lease if Premier failed to do so.

Premier emailed a response to Appellants on March 27, 2007, attaching numerous documents in an attempt to comply with Appellants' "demands." Appellants' attorney sent another letter to Premier via fax and certified mail on March 30, 2007, indicating that the "default[s]" listed above had not been "cured" and that it considered many of the documents submitted by Premier to be insufficient to fulfill its obligations under the Lease. The letter further indicated that Appellants "agree[d] that the court's anticipated ruling on [the issue of whether the sale of social memberships to non-residents constitutes a breach of the Lease] will apply to both our earlier January 31, 2007 default letter, as well as the March 9 default letter."

On April 2, 2007, Appellants filed their answer to the petition. They denied for lack of sufficient knowledge the allegation that Premier had allowed non-residents to be social members of the Golf Club "for some time" and denied all allegations concerning the purpose and importance of allowing non-residents to become social members of the Golf Club. Appellants also stated that they "admit there is no provision in the Lease that specifically discusses the consumption of outside food at the [Clubhouse] but state[ ] that any such ban is inconsistent with the intent of the parties and is inconsistent with the interests of the members of the [Clubhouse]." They asserted that Premier failed to state a claim upon which relief could be granted and was barred from any relief due to "unclean hands, waiver and/or estoppel," without specifying why.

Appellants also filed two counterclaims, asserting that Premier was in material breach of the Development Agreement and the Lease due to failure to cure the defaults listed as stated in the January 31, March 9, and March 30, 2007 letters and that they had suffered damages as a result. Appellants alleged that the Clubhouse had always been "marketed as an exclusive club that is available only to golf members of the Golf Club and residents of the Development" and that, to their knowledge, Premier was selling social memberships only to residents prior to January 31, 2007. Appellants further alleged that Premier's failure to obtain necessary building permits "is a serious safety issue that puts all users of the Resident's Club at risk."

On April 2, 2007, the trial court entered a preliminary injunction in favor of Premier on its original petition, which concerned matters raised in the January 31, 2007 letter. A few days later, Premier moved for leave to file a second amended petition to request declaratory and injunctive relief concerning matters raised in the March 9 and March 30, 2007 letters, which the court granted. In addition to the allegations set forth above, Premier made numerous conclusory allegations concerning whether it was in default due to the items in the letters and the purpose of the relevant provisions under the Lease. Appel-

lants denied these additional allegations in their answer.

On April 6, 2007, the court held a hearing and entered a temporary restraining order prohibiting Appellants from terminating the Lease until April 17, 2007, at 5:00 p.m. On April 17, 2007, the court extended the TRO until April 27, 2007, at 5:00 p.m.

On April 23, 2007, the court appointed a Receiver to determine whether the Clubhouse was being properly managed and maintained. The Receiver visited the Clubhouse and submitted his report on April 27, 2007, indicating that the Clubhouse was well managed and that there were no noticeable problems with the buildings.

Shortly after 5:00 p.m. on April 27, 2007, Appellants hand-delivered a "Notice of Termination" to Premier, stating that Premier remained in default after being given thirty days to cure for failing to: (1) use "qualified and insured contractors" for the alterations, (2) secure all required permits, (3) provide a list of subcontractors and suppliers, and (4) obtain insurance coverage effective from May 1, 2005, forward. Appellants initiated an unlawful detainer action against Premier on April 30, 2007, which was assigned to Division III of the Clay County Circuit Court. The declaratory judgment action remained pending in Division II.

Also on April 30, 2007, the court in the declaratory judgment action entered a preliminary injunction prohibiting Appellants from terminating the Lease "based on the alleged defaults set forth in the March 9, 2007 notice of default." The court further ordered that its previous appointment of a Receiver would remain in effect.

Premier filed a reply to Appellants' counterclaims on May 2, 2007, denying all of Appellants' allegations and setting forth numerous purported affirmative defenses. Premier claimed that Appellants were barred from asserting any breach of contract due to their "failure to honor their obligation to fund any shortfall between the homeowners' social membership dues and the maintenance and operating costs of the Residents' Club" since February 2007, which it asserted was a condition precedent under the Lease. Premier further alleged that Appellants' claims were barred due to unclean hands because they had "declared technical defaults as a pretext in their 'nuclear war' to attempt to force Plaintiff to agree to a Lease Amendment restricting the sale of social memberships to Plaintiff's golf club." Premier contended that Appellants' claims were barred due to waiver or estoppel because they "unreasonably delayed their declarations of default" over matters of which they were aware or should have been aware and allowed Premier to continue with construction to its detriment. They further asserted that the claims were barred because "any breaches ... that may exist or have existed are purely technical and not material." Finally, Premier asserted that Appellants' claims were barred because they would be unjustly enriched by receiving the benefit of all the renovations Premier completed on the Clubhouse for use in the Golf Club.

The parties continued to correspond for several months, but they were unable to resolve their disputes. After being served with the petition in the unlawful detainer action on May 14, 2007, Premier eventually filed a motion for summary judgment and a motion to stay the case pending the outcome of the declaratory judgment action at issue in this appeal. On August 6, 2007, the court held a hearing and set the unlawful detainer action for a jury trial on January 14, 2008, 2008 WL 4771579.

Also on August 6, 2007, Premier filed a motion for summary judgment on its petition in the declaratory judgment action, including a statement of uncontroverted material facts and suggestions in support. Premier argued that it was not in default under the Lease because the alleged defaults were all technical and were not material breaches sufficient to terminate the Lease. It further argued that it was not in default because the various letters from Appellants did not comply with the notice provisions in the Lease and, therefore, did not trigger Appellants' right to terminate the Lease. In their response in opposition, Appellants contended that summary judgment was improper because Premier's motion failed to comply with Rule 74.04(c) and Premier failed to establish that it was entitled to judgment as a matter of law.

The court entered summary judgment, including findings of fact and conclusions of law, in Premier's favor on January 7, 2008. The court concluded that Premier was not in default of the Lease for any of the bases asserted in any of the notices of default.

Appellants appeal from the summary judgment in favor of Premier on its second amended petition for declaratory relief. We note that the court did not expressly rule on Appellants' counterclaims, but they involved the same issues and evidence, so the court effectively denied the counterclaims by entering summary judgment in favor of Premier. The unlawful detainer action has been stayed pending the outcome of this appeal and the declaratory judgment proceedings.

"Appellate review of the grant of summary judgment is *de novo.*" *Midwestern Health Mgmt., Inc. v. Walker*, 208 S.W.3d 295, 297 (Mo.App. W.D.2006). "The rec-

ord below is reviewed in the light most favorable to the party against whom summary judgment was entered, and that party is entitled to the benefit of all reasonable inferences from the record." *Lewis v. Biegel*, 204 S.W.3d 354, 356 (Mo.App. W.D. 2006) (internal quotation omitted). However, "[f]acts contained in affidavits or otherwise in support of a party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion." *Walker*, 208 S.W.3d at 297. Affidavits in support of or opposition to motions for summary judgment "must be made on personal knowledge, set forth facts as would be admissible in evidence, and show that the affiant is competent to testify." *Syngenta Crop Prot., Inc. v. Outdoor Equip. Co.*, 241 S.W.3d 425, 428 (Mo.App. E.D.2007); Rule 74.04(e).

"Summary judgment is appropriate only when the record demonstrates that there are no genuine disputes regarding material facts and that the moving party is entitled to judgment as a matter of law." *Biegel*, 204 S.W.3d at 356 (internal quotation omitted). "A 'material fact' is a fact of such significance or probative value as to control or determine the outcome of the litigation." *Id.* "If the record contains competent evidence that two plausible, but contradictory accounts of essential facts exist, then a genuine issue of material fact remains to be resolved, because fair minded people, exercising reasonable judgment could reach different conclusions on the issue in controversy." *Id.* (internal quotation omitted).

In their first point,[2] Appellants assert that the trial court erred in granting Premier's motion for summary judgment be-

---

**2.** Preliminarily, Premier asserts that this appeal should be dismissed because Appellants' jurisdictional statement, statement of facts, and both points relied on fail to comply with Rule 84.04. We disagree.

cause the motion failed to comply with Rule 74.04(c).[3] They contend that Premier's statement of uncontroverted material facts failed to set out the facts in separately numbered paragraphs, many of the purported facts were not supported by specific references to pleadings, and several of the purported facts referred to testimony or arguments at hearings without attaching transcripts. Appellants further assert that the affidavits and exhibits that were attached in support of certain purported facts were inadmissible and not properly before the court because the affidavits contained hearsay and/or conclusions of law rather than factual statements and the exhibits lacked foundation.

■■■ "Generally, failure to comply with Rule 74.04(c)(1) warrants a trial court's denial of a summary judgment motion and warrants an appellate court's reversal of the grant of summary judgment." *Gillespie v. Estate of McPherson,* 159 S.W.3d 466, 470 (Mo.App. E.D.2005). However, "the interest of judicial efficiency and economy is not met by adopting an absolute or *per se* rule precluding summary judgment for failure to comply with Rule 74.04(c)(1)." *Rodgers v. Threlkeld,* 22 S.W.3d 706, 710–11 (Mo.App. W.D.1999). "[W]hen the issues and the documents in support of the motion are clear to the litigants, the trial court, and the appellate court, the failure to comply with Rule 74.04 does not per se preclude the granting of summary judgment nor the affirming of such a judgment." *Gillespie,* 159 S.W.3d at 470. Where "the issues are clear, the material facts are not disputed, and the question posed is one of law," procedural deficiencies will not preclude addressing a motion for summary judgment on the merits. *Sotirescu v. Sotirescu,* 52 S.W.3d 1, 7 (Mo.App. E.D.2001).

Premier concedes that its motion did not strictly comply with Rule 74.04, but it claims that any deficiencies were inconsequential or concerned surplus information and did not preclude the trial court from ruling on the motion. We note that both Appellants' and Premier's pleadings throughout these proceedings, including this appeal, are marked by conclusory allegations and argumentative statements of "fact." We need not decide whether the form of the motion precludes entry of summary judgment because we find that, even if the motion was procedurally sufficient, Premier failed to show that there were no genuine issues of material fact and that it was entitled to judgment as a matter of law, as Appellants argue in their second point on appeal.

■■■ Appellants contend in Point II that the trial court erred in granting summary judgment because numerous genuine issues of material fact remain, including whether Premier was in default under several provisions of the Lease, whether any such defaults constituted material breaches to support termination of the Lease, whether Premier timely cured the alleged

**3.** Rule 74.04(c) was amended effective July 1, 2008, but Premier's motion was filed on August 6, 2007. When the motion was filed, Rule 74.04(c) provided, in pertinent part:

(1) *Motions for Summary Judgment.* A motion for summary judgment shall summarily state the legal basis for the motion.

A statement of uncontroverted material facts shall be attached to the motion. The statement shall state with particularity in separately numbered paragraphs each ma-

terial fact as to which movant claims there is no genuine issue, with specific references to the pleadings, discovery, exhibits or affidavits that demonstrate the lack of a genuine issue as to such facts.

Attached to the statement shall be a copy of all discovery, exhibits or affidavits on which the motion relies.

Movant shall file a separate legal memorandum explaining why summary judgment should be granted.

defaults, and whether the applicable lease provisions had been waived by a course of conduct between the parties. Similarly, Appellants argued in Point I that the trial court improperly made credibility determinations on disputed facts in ruling on the motion for summary judgment. Appellants' arguments focus on the court's determination that any defaults by Premier were not material breaches of the Lease.

Premier replies that it is entitled to summary judgment because it was not in default for any of the reasons asserted by Appellants, any issues for which it was in default were not material breaches but only "technical defaults," and/or any such breaches were cured when it provided documentary evidence upon request or were mooted by its completion of construction and obtaining a certificate of occupancy from the city. Premier contends that the trial court was entitled to determine whether any defaults were material breaches in ruling on the motion for summary judgment. It asserts that "the great weight of Missouri case law" indicates that summary judgments will be upheld even where the trial court made determinations regarding the materiality of a breach.

▆▆▆ "In Missouri a lease is acknowledged as having a dual character: it is both a conveyance and a contract." *Wetherbee, Ltd. v. Allred,* 969 S.W.2d 756, 758 (Mo.App. W.D.1998). "The usual contract remedies are available to the tenant in the event that a provision of the lease contract is breached, including damages, reformation and rescission of the contract." *Id.*

"Where a party fails to perform according to the terms of the contract, it must be determined whether the breach is material. If the breach is material or if the breaching party's performance is a condition to the aggrieved party's performance, the aggrieved party may cancel the contract. If the breach is not material, the aggrieved party may sue for partial breach, but may not cancel. In determining whether a breach is material, an important consideration is the degree of hardship on the breaching party and the extent to which the aggrieved party has received the substantial benefit of the promised performance and the adequacy with which he may be compensated for partial breach by damages."

*Campbell v. Shaw,* 947 S.W.2d 128, 131 (Mo.App. W.D.1997) (quoting *Curt Ogden Equip. Co. v. Murphy Leasing Co.,* 895 S.W.2d 604, 608–09 (Mo.App. E.D.1995) (internal citations omitted)). It is well settled in Missouri that "[w]hether a breach is material or immaterial is a question of fact." *Id.* at 132; *see also L.L. Lewis Constr., L.L.C. v. Adrian,* 142 S.W.3d 255, 260 (Mo.App. W.D.2004); *Guidry v. Charter Commc'ns, Inc.,* 269 S.W.3d 520, 531 (Mo.App. E.D.2008); *Classic Kitchens & Interiors v. Johnson,* 110 S.W.3d 412, 417 (Mo.App. S.D.2003). Where "a genuine issue exists as to whether [failure to comply with a contractual term] constituted a material breach, the circuit court should not have granted summary judgment on [that] ground." *Campbell,* 947 S.W.2d at 132.

Despite the overwhelming authority that the materiality of a breach is a question of fact, Premier cites *Rocha v. Metropolitan Property & Casualty Insurance Co.,* 14 S.W.3d 242 (Mo.App. W.D.2000), and *Hoffman v. Kaplan,* 875 S.W.2d 948 (Mo.App. E.D.1994), for the proposition that a circuit court may decide whether contract terms are material when ruling on a summary judgment. Premier's reliance is misplaced, as both cases are factually distinguishable. In *Rocha,* the court found that an insured's failure to notify the insurer of a lawsuit was a material breach of the insurance contract based on a legal pre-

sumption of prejudice, which the insured failed to rebut. 14 S.W.3d at 247–48. In *Hoffman*, the court affirmed the circuit court's entry of summary judgment allowing reformation of a deed based on a finding that there was a mutual mistake in the drafting of the deed. 875 S.W.2d at 949. The appellate court agreed with the circuit's court's determination that failure to comply with a notification provision in the agreement between the parties was not material because it did not warrant setting aside the clear intent of the parties when they entered into the agreement and executed the deed. *Id.* at 952–53. In contrast, in the case at bar, no legal presumptions apply, and the parties dispute their intent in entering into the Lease.

Appellants contend that Premier was in material breach of the Lease for five reasons, as set forth in the various notices of default: (1) offering social memberships to non-Staley Farms residents; (2) failing to obtain required permits prior to beginning construction; (3) failing to provide documentation that all contractors are insured; (4) failing to provide a list of subcontractors and suppliers and copies of their mechanic's lien waivers; and (5) failing to obtain liability and casualty insurance coverage with the specified terms dating from May 1, 2005, through the present.

The parties dispute whether Premier sold social memberships to non-residents prior to January 31, 2007, whether the Lease allowed such action, and whether the parties intended to allow such action when they entered into the Lease. In its findings of fact and conclusions of law, the trial court made numerous findings of fact concerning this allegation of default. It is not clear whether the court found the lease terms to be ambiguous or unambiguous, but the court made several credibility determinations as to the parties' intentions in entering into the Lease. The court

adopted Premier's assertions that the Clubhouse was intended to attract non-residents, that Premier had been selling social memberships to non-residents prior to January 31, 2007, and that Mark Simpson left a voicemail with Premier's managing member, Marty Ostronic, "threatening 'nuclear war' if Premier would not agree to amend the Lease to restrict the sale of social memberships to residents." The court then concluded that, as a matter of law, Premier was not in default for selling social memberships to non-residents because the Lease permitted Premier's actions by not expressly prohibiting them.

Concerning the other allegations of default, much of the evidence is undisputed:

Premier failed to obtain the required building permits prior to starting construction on the alterations, and Marty Ostronic was convicted of an ordinance violation and fined $100 for failing to do so. However, Premier did eventually obtain the required permits, the alterations passed the city's inspection, and the city issued an occupancy permit for the Clubhouse. Premier provided evidence that the contractors were insured after Appellants requested that information. Premier also provided copies of mechanic's lien waivers from each of the subcontractors and suppliers, eventually providing unconditional lien waivers. Premier did not immediately obtain casualty and liability insurance on the Clubhouse as required under the Lease, but it had the policies amended to include the necessary provisions and to retroactively cover the Clubhouse from May 1, 2005, forward when Appellants demanded evidence of insurance coverage. Premier eventually delivered copies of the amended policies to Appellants, and the insurer asserted in an affidavit that there had been no claims on the policies.

Appellants dispute whether many of the documents provided as evidence of compliance are reliable and/or have adequate foundation to be admissible. They also assert that Premier's failure to immediately obtain building permits, unconditional mechanic's lien waivers, and insurance on the Clubhouse subjected them to the risk of liability and that they are still at risk despite the fact that the construction has been completed and an occupancy permit has been issued.

The court concluded that Appellants could not terminate the Lease for any of these allegations because they had failed to comply with the lease provisions for notice of default, except concerning the lack of building permits. Nevertheless, the court also found that none of the alleged breaches were material, explaining:

> Landlord has not shown that termination is necessary to ensure the benefit of its bargain. This case involves a dollar per year lease that calls for tenant to bear the risk and expense of operating the leased premises. The benefit to the landlord is not in rental income but in the tenant's maintenance, improvement and operation of the leased premises at its expense (except for certain subsidies that the landlord agree to contribute). Landlord has not shown that it suffered any liability or detriment as a result of the tenant's conduct. The Court has appointed a receiver to resolve any of the landlord's stated concerns regarding the safety of the leasehold premises and the Receiver has reported that the premises are in good condition and under intelligent management. There is no basis to terminate the lease where there has been no harm to the landlord.

The court later explained this conclusion in more detail as to each of the alleged grounds for default. Generally, the court concluded that the Lease did not require Premier to provide documentation of its compliance but only to hold Appellants harmless for any liability arising from its failure to comply. Moreover, the court found that all documentation provided by Premier was sufficient to meet its obligations under the Lease and thereby cured any default concerning the failure to provide such documentation. The court further concluded that the completion of construction and obtaining a certificate of occupancy from the city by the agreed upon deadline without any evidence of any claims being filed against Premier or Appellants rendered any failure to comply with applicable laws and the lease provisions concerning building permits, insurance on the Clubhouse and contractors, and mechanic's lien waivers either immaterial or moot.

In addressing the parties' affirmative defenses, the court concluded that Appellants had "unclean hands" because its assertions of default under the Lease

> are a pretext to punish Premier for selling outside social memberships, which sales are not prohibited by the Lease. Defendants expressly threatened "nuclear war" over Premier's refusal to capitulate and in an effort to damage Premier's standing with the residential members of the Golf Course, they circulated a misleading letter implying that the Sports & Rec Club is a death trap, when in fact they knew it had passed City inspection and it had received a clean bill of health from the Receiver. They also suspended subsidy payments to Premier that they had committed themselves to pay.

The court's explanation concerning the parties' affirmative defenses is indicative of the court's credibility determinations in ruling on the motion for summary judgment. A thorough review of the record reveals that the circuit court made several

determinations concerning disputed material facts, including whether the alleged defaults were material breaches of the Lease, in ruling on Premier's motion for summary judgment. Where "a genuine issue exists as to whether [failure to comply with a contractual term] constituted a material breach, the circuit court should not have granted summary judgment on [that] ground." *Campbell*, 947 S.W.2d at 132.

Accordingly, the summary judgment is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

All concur.